UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF INDIANA
HAMMOND DIVISION

| | |
|---|---|
| CHASE CALDWELL, ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| vs. ) | CAUSE NO. 2:20CV198-PPS |
| ) | |
| N. WRIGHT, ) | |
| ) | |
| Defendant. ) | |

**OPINION AND ORDER**

Chase Caldwell has an unfortunate history of mental illness. When his father attempted to check him into a mental health facility on an emergency basis, Caldwell was uncooperative and the police were called. Officer Nicholas Wright and others from the Merrillville, Indiana Police Department responded to the scene, and Officer Wright briefly restrained Caldwell in the ensuing encounter. Following my ruling on an earlier motion to dismiss [DE 19], what remains in this case are the claims of Caldwell against Officer Wright for an alleged Fourth Amendment violation based on Officer Wright's restraint of Caldwell. Wright now seeks summary judgment on the grounds, among others, that he acted reasonably in his restraint of Caldwell. Based on the undisputed facts detailed below, I agree with Wright that he acted entirely reasonably on the day in question, and no reasonable jury could find otherwise. For this reason, and others, summary judgment will therefore be GRANTED.

## **Summary Judgment Standards**

Rule 56 of the Federal Rules of Civil Procedure provides that "[t]he court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(a).  A motion for summary judgment has been described as the time in a lawsuit to "put up or shut up."  *Grant v. Trustees of Indiana University*, 870 F.3d 562, 568 (7th Cir. 2017). A genuine dispute of material fact exists when "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). Thus, not every dispute between the parties makes summary judgment inappropriate.  "Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." *Id*.

The determination what material facts are undisputed is obviously critical in the summary judgment context, and the rule requires the parties to support facts, and disputes of fact, by "citing to particular parts of materials in the record," or by "showing that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact." Fed.R.Civ.P. 56(c)(1)(A) and (B).  In opposition to the summary judgment motion, Caldwell offers no evidence and cites no evidence.  [DE 56.] Instead, he merely offers an unsupported recitation of his view of the events underlying his complaint.  Because Caldwell fails to comply with Rule 56(c)(1)(A)'s requirement that he cite to evidence of

2

record, and because Wright has supported his assertion of material facts with such cites, I will consider Wright's factual assertions to be undisputed for purposes of the motion, pursuant to Rule 56(e)(2).

## Undisputed Material Facts

On January 30, 2020, Corporal Henry, Officer Kloc, and Officer Wright of the Merrillville Police Department were dispatched to Regional Mental Health. The officers were called there because "employees needed assistance getting a male back into the building who had orders to go to the psych unit." [DE 54-1 at 2.] The male in question was Chase Caldwell, who was then 28 years old. [DE 54-1 at 2; DE 54-2 at ¶¶3, 4; DE 54-4 at 1.] On arriving, Wright spoke with Rodney Caldwell, who identified himself as the father and legal guardian of Chase. [DE 54-2 at ¶5.] (For clarity sake and meaning no disrespect, I will use the Caldwells' first names). Rodney advised that he had brought Chase to RMH to speak with a mental health professional and to get Chase admitted. [*Id*.] Chase has been diagnosed with severe acute paranoid schizophrenia and "schizoaffective disorder, bipolar type severe in acute mania." [DE 54-4 at 4, 5.] An order of the Porter County Superior Court dated August 3, 2016 adjudged Chase Caldwell to be "an incapacitated person" and appointed Rodney Caldwell as the guardian of Chase's personal and financial affairs. [DE 54-7.]

Chase was subject to a Pretrial Supervision order issued by Judge David Chidester of the Porter County Superior Court on October 23, 2019, that required him to "Report to Porter Starke Services and begin/resume treatment, take prescribed

3

medications and refrain from new criminal activity." [DE 54-6 at 2.] Because of prior incidents, Porter Starke was not an option for Chase's treatment. Instead, according to Chase, he was at RMH on January 30, 2020 "for an intake assessment so I could undergo appropriate mental treatment as ordered by Judge David Chidester." [DE 54-5 at ¶6.]

RMH records state that when he "presented to intake" on January 30, 2020, Chase was "irritable, hostile, combative, defensive and evasive." [DE 54-4 at 1.] The medical record also indicates that Chase "would not allow his father to answer questions" and "left the intake room, refusing to answer any more questions with his father present," so that intake was not completed and the case "was transferred to emergency services to complete assessment." [*Id*.] Consistent with this account, Rodney advised Officer Wright that Chase was refusing to take his medication, which makes him extremely paranoid, and that Chase became upset during his intake interview and walked out of the facility. [DE 54-2 at ¶¶7, 8.]

Officer Wright asked Rodney if he had an Emergency Detention Order for Chase, and Rodney replied that he did not have an order signed by a physician or a judge. [DE 54-2 at ¶9.] Corporal Henry confirmed that answer with RMH staff, who told him that Rodney, as Chase's guardian, had voluntarily signed Chase into the facility, which was the equivalent of Chase signing himself in. [DE 54-2 at ¶10.] Wright and Henry next spoke to Chase, who said that he was at RMH for a mental evaluation and to speak with a doctor. [DE 54-2 at ¶11.] Chase acknowledged that he had become upset and left the building because Rodney was answering questions on his behalf. [*Id*.]

4

The officers told Rodney that without a signed Emergency Detention Order they could not physically force Chase to go inside to be treated. [DE 54-2 at ¶12.] Rodney re-entered RMH to inquire what was needed to get an Emergency Detention Order, while Chase remained outside the building. [*Id.*] Rodney completed an Application for Emergency Detention of Mentally Ill and Dangerous Person," reporting that Chase was paranoid, threatening his father, and not compliant with his medication. [DE 54-8 at 1.] Dr. Tahira Jabeen then executed a "Physician's Emergency Statement," indicating that "Chase Caldwell may be mentally ill and dangerous, as those terms are defined in IC 12-7-2-130(1) and IC 12-7-2-56." [DE 54-3 at 1.] The statement further reported that Chase "has been without medications," "has physically threatened others," and "is paranoid." [*Id.*] Rodney's application and Dr. Jabeen's statement were the elements required to support a 72-hour involuntary emergency detention under Ind. Code §12-26-5-1.

A short while later, Merrillville police officers were called back to RMH. Dispatch advised that there was now a signed Emergency Detention Order for Chase, and he was still refusing to go inside. [DE 54-2 at ¶13.] Wright approached Rodney, who was standing with RMH staff, and Wright was shown Dr. Jabeen's Physician's Emergency Statement. [DE 54-2 at ¶¶13, 14.]

Wright and Kloc explained to Chase that there was now an Emergency Detention Order and that he needed to go inside RMH for an evaluation. [DE 54-2 at ¶15.]

5

Although Chase was upset, he voluntarily got out of his father's car, and was placed in handcuffs and escorted into the building. [DE 54-2 at ¶16.]

Once inside, Chase became more upset, telling staff that he refused all medication and treatment, and that what was happening was unlawful. [DE 54-2 at ¶17.] RMH staff escorted the officers and Chase to Room 10. [*Id.*] Chase refused to get on the bed, and the officers physically escorted him onto the bed so that his handcuffs could be removed. [DE 54-2 at ¶18.] Because Chase was acting aggressively, RMH staff requested that the officers assist them by holding Chase still while RMH staff gave him medication to calm him down. [DE 54-2 at ¶19.] After the medicine was administered and Chase had calmed down, the handcuffs were removed and the officers left Chase in the care of RMH. [*Id.*]

Chase received a long-acting injection, and spent the night at RMH. [DE 54-4 at 23.] The next morning, his demeanor was pleasant, he reported that he felt significantly improved, and he participated appropriately in group therapy. [*Id.*]

RMH records summarize the events of January 30 as follows:

> Client presents with his father who is his legal guardian…seeking court-ordered treatment due to receiving a disorderly conduct and resisting arrest in September 2019, substance possession in 2011.  Client presented to intake irritable, hostile, combative, defensive and evasive.  Client would not allow his father to answer questions and client was evasive and guarded in regards to answering questions.  Client appeared preoccupied with laws put in place and failed to understand his father was his legal guardian, even when presented with the paperwork.  Client left the intake room, refusing to answer any more questions with his father present and yelled at the financial staff.  Intake was not completed at this time.  The case was transferred to emergency services to complete assessment [and] determine appropriate care.  Prior to the presence of the client, father

> stated that he has a previous diagnosis of Schizoaffective disorder, bipolar type and that he has attempted two prior commitments through the court however was "deemed sane." Father stated out of the presence of the client that he has been having a difficult time getting the client treated due to poor insight into his symptoms. Client stated that he currently unmedicated.
>
> Client was admitted on an Emergency Detention order following his father signing him in due to client running out of building and Police needing to get involved. Client was cooperative with police and staff once on the inpatient psych unit.

[DE 54-4 at 16.] Chase was discharged the next day, January 31, 2020. [DE 54-4 at 18.]

In response to Wright's request for admissions, Chase has admitted that "the officers put handcuffs on [him] as a means to safely transport [him] back into the facility for treatment." [DE 54-9 at ¶12.] Chase has also agreed that "the physicians at regional mental health facility made the decision to forcibly inject [him] with medication(s)." [DE 54-9 at ¶14.] According to Chase's answers to interrogatories, Officer Wright is liable to him because Wright was "present" when Chase "was held on hospital bed and injected," and that he "was held forcibly on a bed." [DE 54-5 at ¶¶11, 13.]

## Discussion

Before addressing Chase's legal claims, a brief primer on involuntary detentions under Indiana law is needed. Indiana Code §12-26-5-1(a) authorizes a person's involuntary detention in a facility for not more than 72 hours if a written application for an emergency detention is filed with the facility in compliance with the statute. There are two parts to the application. First, subsection (b)(1) requires a statement by an applicant of his belief that the person is "mentally ill and either dangerous or gravely

7

disabled" and "in need of immediate restraint." Second, subsection (b)(2) requires a physician's statement that the person may be mentally ill and either dangerous or gravely disabled, based on an examination or information given to the physician.

Rodney's Application for Emergency Detention of a Mentally Ill and Dangerous Person and Dr. Jabeem's Physician's Emergency Statement appear to fulfill the statutory requirements. [DE 54-8, DE 54-3.] Once both of these documents were executed, at 12:30 and 12:45 p.m. on January 30, 2020, RMH could treat Chase as being subject to an involuntary detention order, or Emergency Detention Order.

**Fourth Amendment Seizure Claim**

Chase alleges that Wright violated the Fourth and Fourteenth Amendments by handcuffing Chase and escorting him into RMH, and by Wright's participation in the forcible administration of medicine to which Chase did not consent. [DE 31 at 1-3.] The standard governing claims of unlawful seizure brought under the Fourth Amendment is objective reasonableness: "The Fourth Amendment, made applicable to the States through the Fourteenth Amendment, protects '[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures' U.S. Const. amend. IV. This protection exists in both the criminal and civil contexts." *Gaetjens v. City of Loves Park*, 4 F.4th 487, 491 (7th Cir. 2021), citing *Soldal v. Cook County*, 506 U.S. 56, 67 (1992).

"The ultimate touchstone of the Fourth Amendment is 'reasonableness.'" *Brigham City v. Stuart*, 547 U.S. 398, 403 (2006). As the Supreme Court has recently held:

8

"The Fourth Amendment does not forbid all or even most seizures – only unreasonable ones." *Torres v. Madrid*, 141 S.Ct. 989, 1003 (2021). The reasonableness standard is objective and fact-intensive, asking whether the seizure and the force used to effect it were reasonable under the totality of the circumstances obtaining at the time. *Graham v. Connor*, 490 U.S. 386, 395 (1989); *Tennessee v. Garner*, 471 U.S. 1, 8-9 (1985); *Weinmann v. McClone,* 787 F.3d 444, 448-49 (7th Cir. 2015). "With the right to effect a mental-health seizure of a person comes the right to use reasonable force to effect the seizure." *Johnson v. Community Hospital Anderson/Madison County*, No. 1:20-cv-00855-JRS-MPB, 2022 WL 900021, at *6 (S.D.Ind. Mar. 28, 2022), citing *Graham*, 490 U.S. at 396.

On the undisputed facts, I conclude as a matter of law that Officer Wright's conduct was reasonable under the totality of the circumstances, assessed from the perspective of a reasonable officer on the scene. Chase was at RMH for the purpose of a mental health assessment pursuant to court order. His father Rodney, who was his appointed guardian, sought to have Chase admitted because he was not taking his medicine, was extremely paranoid, and was behaving in a threatening manner. In view of Chase's uncooperative, even hostile and combative behavior that day, Rodney sought an Emergency Detention Order so that Chase could be maintained and treated involuntarily at RMH. The document was shown to Wright and described to him as an Emergency Detention Order (EDO). It was signed by a physician and included the conclusion that Chase may be mentally ill and dangerous, as those terms are defined in the Indiana Code. RMH relied on the document as an EDO. RMH personnel had

9

previously advised Officer Wright that Rodney, acting as Chase's guardian, had voluntarily signed Chase into the facility for treatment. In these circumstances, Officer Wright acted reasonably when he handcuffed Chase, escorted him into RMH, and, at the request of medical staff, assisted in restraining Chase for the administration of psychiatric medication. The undisputed facts support the conclusion as a matter of law that Officer Wright's conduct did not constitute an unreasonable seizure in violation of the Fourth Amendment.

**The Fourteenth Amendment Claim**

Chase's complaint also invokes the Fourteenth Amendment: "I'm also suing for XIV amendment...violation because officer N Wright restrained my right to liberty life and property while I was seized and escorted into a locked inpatient facility at Regional Mental Health." [DE 31 at 3.] It is not entirely clear that Chase intends this as a claim distinct from his claim of an unreasonable seizure under the Fourth Amendment, which is made applicable to local police officers as state actors by the Fourteenth Amendment. *Zoretic v. Darge*, 832 F.3d 639, 643 (7th Cir. 2016). Even if Chase intends a Fourteenth Amendment claim separate from his Fourth Amendment claim based on the same facts, it is unclear if such a claim is viable. In *Lewis v. City of Chicago*, 914 F.3d 472, 475, 478 (7th Cir. 2019), the Seventh Circuit held that the "Fourth Amendment, not the Due Process Clause, governs a claim for wrongful pretrial detention," and that "a §1983 claim for unlawful pretrial detention rests *exclusively* on the Fourth Amendment." (Emphasis in original.) *See also Kuri v. City of Chicago*, 990 F.3d 573 (7th Cir. 2021).

In any event, Chase does not identify a particular due process standard applicable to the circumstances of this case, either in the complaint or in his opposition to the summary judgment motion. Wright cites these principles:

> The Due Process Clause of the Fourteenth Amendment prohibits the use of bodily restraints in a manner that serves to punish a pre-trial detainee. The use of bodily restraints constitutes punishment in the constitutional sense if their sue is not rationally related to a legitimate nonpunitive government purpose or they appear excessive in relation to the purpose they allegedly serve.

*May v. Sheahan*, 226 F.3d 876, 884 (7th Cir. 2000) (internal citations omitted). Chase fails to demonstrate a substantive due process violation because he has not disputed that the "officers put handcuffs on [him] as a means to safely transport [him] back into the facility for treatment." [DE 54-9 at ¶12.] This use of bodily restraints was not punitive or excessive, and was rationally related to the legitimate government purpose of assisting to effectuate what appeared to be a legitimate Emergency Detention Order and the intent of Chase's guardian to admit him for mental health treatment. The same is true of Officer Wright's assistance in restraining Wright so that medical personnel could administer an injection, which Chase has also agreed was a treatment decided upon by physicians at RMH. [DE 54-9 at ¶14.]

**Qualified Immunity**

Even if Chase could establish that Officer Wright acted in an unreasonable way on the day in question, Wright would nonetheless have the protection of qualified immunity. The doctrine of qualified immunity "operates 'to ensure that before they are subjected to suit, officers are on notice their conduct is unlawful.'" *Hope v. Pelzer*, 536

11

U.S. 730, 739 (2002), quoting *Saucier v. Katz*, 533 U.S. 194, 206 (2001). Qualified immunity presents a question of law for the court. *Smith v. Finkley*, 10 F.4th 725, 734 (7th Cir. 2021).

Once a defendant has raised the defense of qualified immunity, "it becomes the plaintiff's burden to defeat it." *Estate of Escobedo v. Martin*, 702 F.3d 388, 404 (7th Cir. 2012), quoting *Wheeler v. Lawson*, 539 F.3d 629, 639 (7th Cir. 2008). When a defendant asserts qualified immunity, the plaintiff must first demonstrate that the facts, when viewed in the light most favorable to him, demonstrate a violation of his constitutional rights, and second that the defendant's conduct violated clearly established statutory or constitutional rights of which a reasonable person would have known. *Gaddis v. DeMattei*, __ F.4th __, 2022 WL 986440, at *4 (7th Cir. Apr. 1, 2022). The "clearly established" right "must be specific to the particular facts of the case." *Id*.

Caldwell has not attempted to meet these burdens. Particularly in light of my previous determinations about the merits of Caldwell's constitutional claims, Wright is entitled to qualified immunity given Caldwell's failure to demonstrate that Wright violated clearly established constitutional rights when he handcuffed Caldwell to escort him into the RMH building based on the Emergency Detention Order, and assisted in holding Caldwell down for the administration of an injection ordered by physicians at the facility. Qualified immunity is intended to protect "all but the plainly incompetent or those who knowingly violate the law."" *Malley v. Briggs*, 475 U.S. 335, 341 (1986); *Smith*, 10 F.4th at 737. On the undisputed facts, even when construed in the light most

12

favorable to Chase Caldwell, Officer Wright was neither, and is protected by qualified immunity from Caldwell's constitutional claims.

## Conclusion

As a matter of law, the facts available to Officer Nicholas Wright on January 30, 2020 would warrant a person of reasonable caution to believe that the actions he took in seizing Chase Caldwell for psychiatric treatment at RMH were appropriate. *United States v. Wanjiku*, 919 F.3d 472, 487 (7th Cir. 2019). Caldwell fails to demonstrate that he could establish a Fourth Amendment violation. Because Wright's conduct was neither punitive nor excessive, but rationally related to carrying out the Emergency Detention Order, the Fourteenth Amendment is not shown to have been violated. In addition, qualified immunity protects Wright from Caldwell's claims under these circumstances.

**ACCORDINGLY:**

Defendant Wright's Motion for Summary Judgment [DE 53] is GRANTED.

The Clerk shall ENTER summary judgment against plaintiff Chase Caldwell and in favor of defendant N. Wright, thereby CLOSING this case.

**SO ORDERED**.

ENTERED: April 26, 2022.

      /s/ Philip P. Simon
**UNITED STATES DISTRICT JUDGE**